Jennie Sundene and Jeannette Brandenburg, Appellants, v. Fred Koppenhoefer, Appellee.

Gen. No. 45,284.

Opinion filed April 9, 1951. Released for publication May 7, 1951.

JOSEPH D. RYAN, LOUIS G. DAVIDSON, GEORGE D. SULLIVAN, JR., and ARTHUR RYAN, all of Chicago, for appellants.

LOUIS B. SIMON, of Chicago, for appellee; ARTHUR A. WOLFINSOHN, of Chicago, of counsel.

MR. JUSTICE FEINBERG delivered the opinion of the court.

Plaintiffs brought this action for personal injuries, resulting from an automobile collision between the car in which plaintiffs were riding and the car operated by defendant. Upon a trial with a jury a verdict of not guilty was returned and judgment entered thereon, from which plaintiffs take this appeal.

The principal ground urged for reversal is that the verdict is against the manifest weight of the evidence. The consideration of this question requires a detailed statement of the facts appearing in this record.

On November 16, 1946, plaintiffs were in a funeral car in a funeral procession consisting of 25 to 30 automobiles. The lead car was the hearse. The car in which plaintiffs were riding immediately followed the hearse. They were proceeding to the Ridgewood Cemetery, located on Milwaukee avenue northwest of Golf Road. Milwaukee avenue was a state highway four lanes wide. The cemetery was on the west side of the Milwaukee avenue highway. The funeral cars proceeded northwest on Milwaukee avenue, and as the hearse reached the entrance to the cemetery, it made a left-hand turn and was completely off the paved highway and close to the entrance gate. The car following, in which plaintiffs were riding, also made a left-hand turn, and this car was partly on the shoulder of the highway and partly on the southbound lane of the highway. The hearse and plaintiffs' car remained standing for a signal to proceed into the cemetery. While standing, a collision occurred between defendant's car and plaintiffs' car.

Defendant testified that he was familiar with the location of the cemetery and the physical surroundings, having driven past the cemetery frequently for about 23 years; that as he was driving his car, with a passenger sitting in the front seat with him and an-

other passenger in the rear seat, he could see for a distance of "a block or two from a half a mile"; that when he was 200 feet away from the entrance to the cemetery he could see the line of cars traveling in the opposite direction toward the cemetery; that when he was 95 feet away the hearse turned in; that he was driving his car at that time about 35 to 40 miles an hour; that he saw the other cars following the hearse when it turned in toward the cemetery gate; that he started to apply his brakes, and he skidded into the car in which plaintiffs were riding; that there was enough room between the second and third cars for a car to go through; that the reason he didn't drive his car through that opening was that he had no control over it; that "the car would not respond to what I was trying to do, to right it. It was just like ice, on a patch of ice"; that it had been raining off and on during the day, and that at the time of the impact there was a slow drizzle, and it was cloudy and misty; that he could not say whether or not he reduced his speed.

There was testimony by the driver of the hearse that he could see defendant's car about 500 to 600 feet north of the entrance to the cemetery, as he made a left turn toward the gate of the cemetery.

Defendant's own testimony convinces us that he was guilty of negligence in the operation of his automobile immediately prior to and at the time of the impact. When he was 200 feet north of the entrance to the cemetery, he admits, he could see the procession of cars headed toward the cemetery entrance. The lead car was a hearse, and that in itself should have been notice to him there was a funeral procession approaching the cemetery. He was thoroughly familiar with the location of the cemetery entrance and saw the hearse turn in when he was 95 feet away. The universal custom developed over the years, and generally known and observed by those

using the highways, is that automobiles or other vehicles stop to allow a funeral procession to cross in front of them and will not proceed through the procession until the last car has passed. Streetcars and public busses have almost always observed this custom and waited for the cortege to pass. The right of way has been given to funeral processions, even through traffic lights regulated by law, when the red light is against the procession. The custom has sprung from the human instinct to respect the dead and the mourners. The custom has developed this unwritten traffic rule of the highway—at least within this jurisdiction—and one riding in a car in such a funeral procession has a right to expect that others operating motor vehicles will respect this custom and unwritten rule, and has a right to rely upon it. Of this custom so generally known and recognized, we can take judicial notice. In *Valuch v. Rawson,* 270 Ill. App. 583, 596, this court, speaking through Mr. Justice Wilson, said:

"In order that a court may take judicial notice of any fact it must appear that it is a matter of common and general knowledge and that it must be well established and known within the limits of the jurisdiction of the court."

When defendant saw the funeral procession 200 feet away, then is when the law, under the circumstances, required him, in the exercise of ordinary care and with due regard for the safety of others, to reduce his speed and bring his car under control. On his own admission he did not undertake to apply his brakes until he was 90 to 95 feet away, and he could not remember whether he had reduced his speed at that point. The evidence also discloses that after the impact defendant's car traveled between 30 to 40 feet against the fence, indicating the speed at which defendant was operating his car at the time of the impact. The violation by defend-

168

ant of the custom and unwritten rule of the highway, referred to, is very strong evidence of negligence.

■ Where it is clear to us that the verdict is against the manifest weight of the evidence, it becomes our duty to reverse the judgment. *Whittaker v. Chicago Motor Coach Co.,* 334 Ill. App. 629; *Louis v. Checker Taxi Co.,* 318 Ill. App. 71, 82.

■ Complaint is made of an instruction given on behalf of defendant regarding the skidding of defendant's car. For the record the trial judge stated that plaintiffs' counsel, in discussing this instruction in chambers, had agreed that the instruction could be given the jury. Plaintiffs' counsel, upon the hearing of the motion for new trial, respectfully disagreed with the trial judge and disclaimed any such agreement. No stenographic notes were taken of the discussion in chambers, and we must accept the statement of the trial judge as it appears in the record. *People v. Hogan,* 256 Ill. 496, 499. In *People v. Williams,* 91 Ill. 87, 91, it was said:

"It is for the respondent, the judge before whom the cause was tried, to determine the accuracy of the certificate and the matters and things to be incorporated in it."

In *People ex rel. Crymble v. Horton,* 46 Ill. App. 434, 440, this court said:

"The relator is entitled to have signed a true certificate of evidence. As to what constitutes a true certificate, the respondent must decide."

Also, *Conness v. Indiana, I. & I. R. Co.,* 193 Ill. 464, 473. Inasmuch as the case must be retried, the objections to this instruction may be obviated upon another trial.

Dr. Miller, called as an expert witness, testified that he had been asked to examine the plaintiffs on November 14, 1949; that he made an external examination of

the plaintiffs, confined to the head, neck and shoulders; that he took x-rays of the area in question and was qualified as a witness to interpret the x-rays. As to plaintiff Sundene, he testified the x-rays disclosed a small ossicle of bone in the lower portion of the fifth cervical vertebra, about the size of two pinpoints; that the rest of the spine was atrophied, a little thin; that it showed calcification; that he found a subluxation of the right clavicular sternum joint, familiarly referred to as a dislocation, when one joint is in poor relation to another joint; that as to plaintiff Brandenburg, the x-rays showed two or three little calcific deposits over a portion of the left shoulder; that he saw no other pathological condition or abnormalities.

██ The court struck out all of the testimony of this witness because, in answer to a hypothetical question asking for his opinion as to causal connection, the court regarded his answer as based upon subjective symptoms and complaints given him by the plaintiffs upon his examination of them. Even if the trial court were correct in so construing his answer, it did not justify the trial court in striking out all of the testimony of this witness. The testimony given by him as to findings in the x-rays taken by him was clearly competent.

The judgment of the Superior Court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

NIEMEYER, P. J. and TOUHY, J., concur.