NATIONAL AIRCRAFT LEASING, LTD., Plaintiff-Appellant, *v.* AMERICAN AIRLINES, INC., Defendant-Appellee.

First District (5th Division) No. 78-1417

Opinion filed August 3, 1979.

SULLIVAN, P.J., dissenting.

Pedersen and Houpt, of Chicago (Richard V. Houpt, Matt P. Cushner and Marilee Roberg, of counsel), for appellant.

Gardner, Carton and Douglas, of Chicago (George M. Covington and Michael J. Koenigsknecht, of counsel), for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

This action is based upon a contract between National Aircraft Leasing, Ltd. (National), and American Airlines, Inc. (American), in which National was given various rights to 18 airplanes owned by American. National originally brought the action to enjoin American's sale of two of the aircraft but, upon American's completion of the sale, National was allowed to amend its complaint and seek damages. Judgment was entered for American at the close of National's case and National has appealed, contending that (1) the trial court erred in refusing to apply New York law as provided by the contract, and (2) the trial court erred in entering judgment in favor of American at the close of National's case. We affirm. The pertinent facts follow.

On December 29, 1972, American and National entered into a written agreement whereby National was given various rights to lease and purchase a total of 18 aircraft from American's fleet. The planes and the rights thereto were divided into three categories.

First, American agreed to lease two specific planes to National for 24 months and gave National the option to purchase the two planes at the end of the lease term. (Planes in this category will hereinafter be referred to as "Purchase" planes.)

The second category was defined in paragraph 20 of the contract whereby National was granted the option to lease eight additional aircraft (hereinafter "Option" planes) on the same terms and conditions as the Purchase planes. In a letter dated January 19, 1973, National further agreed that, upon its exercise of any of its options to lease an Option plane, it would simultaneously exercise its option to purchase the plane at the end of the lease term. National was to pay $10,000 per option, and was to exercise its options by June 30, 1974.

The third category of planes was created by paragraph 21 of the contract, which granted National a right of first refusal with respect to eight additional aircraft in American's inventory. Under paragraph 21, American agreed to notify National of any bona fide offer to sell or lease any of the eight aircraft (hereinafter "Rights" planes) to a third party. National in turn agreed that it would within 15 days notify American of its agreement to buy or lease such Rights plane under the same terms and conditions. If America were not so notified it would then be free to sell or lease the Rights plane to a third party on terms no more favorable than those offered to National in the notice. If the plane referred to in the notice were not sold to the third party within 60 days thereafter, National's right of first refusal with respect to that airplane would be reinstated. There was no additional consideration paid by National for the right of first refusal. Paragraph 21 also provided that, in the event that National exercised its option on one of its Option planes under paragraph 20, one of the Rights airplanes would become an Option plane, thus maintaining a pool of eight Option planes and reducing the number of Rights planes accordingly.

On July 18, 1973, American notified National of an offer to sell two of the Rights aircraft and invited National to exercise its right of first refusal by notifying American within 15 days that it agreed to acquire the two planes under the same terms and conditions set out in the offer to the third party. As of the date of American's notice, National had exercised its option on three Option planes. Consequently, as of that date, there were five planes in the Purchase category and three Rights planes had shifted to the Option plane pool, leaving a total of eight Option planes and five Rights planes.

On July 26, 1973, National informed American that it was exercising its paragraph 20 option on the five remaining original Option planes, that the five remaining Rights planes therefore became Option planes, and that thus there were no longer any Rights planes which could be sold to a

third party as stated in American's letter of July 18. National made no other response to American's notice of the offer to sell.

On August 1, 1973, National brought this action to enjoin the sale of the two Rights planes. It also sought a temporary injunction, which apparently was not pursued further, and American proceeded to sell the two aircraft. National later amended the complaint to seek $4,000,000 in damages. Judgment was entered for American pursuant to its motion at the end of National's case, after which National moved to file briefs and memoranda on New York law. National's motion was denied and National has appealed.

OPINION

I.

National first contends that the trial court erred in refusing to apply New York law, maintaining that the contract provides that New York law will govern any matters arising under the contract and that the court must take judicial notice of the laws of that State.

■■ While the parties agreed that New York law would apply and the courts will usually follow such an expression of intent (*Hofeld v. Nationwide Life Insurance Co.* (1975), 59 Ill. 2d 522, 529, 322 N.E.2d 454, 458), the provision is not necessarily self-activating. National attached a copy of the contract, with its choice of law provision, to its complaint, but at no time before judgment did either party otherwise bring the matter to the court's attention.

The conduct of the parties notwithstanding, National maintains that the court should have nonetheless applied New York law because it is required by statute to take judicial notice of the statutory and common law of other States. (Ill. Rev. Stat. 1977, ch. 51, par. 48g.) The statute cited by National is part of the Uniform Judicial Notice of Foreign Law Act (Ill. Rev. Stat. 1977, ch. 51, pars. 48g through 48n), which also provides:

"The court may inform itself of such laws in such manner as it may deem proper, and the court may call upon counsel to aid it in obtaining such information.

\* \* \*

Any party may also present to the trial court any admissible evidence of such laws, but, to enable a party to offer evidence of the law in another jurisdiction or to ask that judicial notice be taken thereof, reasonable notice shall be given to the adverse parties in the pleadings or otherwise." Ill. Rev. Stat. 1977, ch. 51, pars. 48h and 48j.

■■ Judicial notice is an evidentiary concept which operates to admit matters into evidence without formal proof (*Cook County Department of Environmental Control v. Tomar Industries*, (1975), 29 Ill. App. 3d 751,

331 N.E.2d 196), but it should not be used by National as a means of evading its responsibility to prove the matters alleged in its pleadings. While National did put the court and American on notice that New York law should be considered, it offered the trial court no relevant provisions of that State's law until after judgment was entered. National's actions at trial having contradicted the notice that was provided by the pleadings, the notice of the applicability of New York law cannot be seen as reasonable under section 4j of the Uniform Judicial Notice of Foreign Law Act (Ill. Rev. Stat. 1977, ch. 51, par. 48j).

Moreover, National has not claimed, nor does the record show, that the trial court did not inform itself of New York law. Upon being presented with National's post-judgment request, the trial court stated that there was no need to consider the briefs and memoranda offered by National because the meaning of the contract was clear and could not be altered. The court is not required to consider everything presented to it pertaining to the foreign law. Rather, it is allowed some exercise of discretion in the matter, for it "may inform itself of such laws in such manner as it may deem proper." (Ill. Rev. Stat. 1977, ch. 51, par. 48h.) Absent a claim that the trial court did not act in accordance with the statute, it must be presumed that it acted properly.

Furthermore, even if it is assumed, *arguendo*, that New York law should have been applied directly, National nonetheless conceded on oral argument that the general principles of construction of contracts are substantially the same in both Illinois and New York and that there are no New York cases directly on point. Therefore, there would be no change in the outcome of the case. Accordingly, we find the contention that the trial court erred in applying the law to be without merit.

## II.

National next contends that the trial court improperly granted judgment for American at the close of National's case. The issue raised by this contention is whether National can exercise its option to an Option plane and activate the shift of a Rights plane after American has notified National of an offer to sell the same Rights plane. The relevant contractual provisions read as follows:

"20. *Lease Option.*

Lessee is hereby granted until June 30, 1974 options to lease from American, under the same terms and conditions set forth in this Agreement including without limitation, the condition of the Aircraft and the option to purchase contained herein, eight (8) additional BAC 1—11 Model 401 aircraft from American's inventory as of the date hereof. Lessee shall pay American the sum of $10,000.00 for each option granted hereunder for a total of

$80,000.00. Such payment shall be made by eight (8) notes (hereinafter referred to as the 'Option Notes') each in the principal amount of $10,000.00 dated as of the date of delivery of Airplane 1 and bearing interest at the rate of eight percent (8%) per annum and in the form attached hereto as Exhibit "B". The principal of the Option Notes shall be payable three years from the date of the Option Notes and applicable interest shall be paid at each anniversary date of the Option Notes. Upon exercise of any of the options granted in this Agreement the Option Note or Option Notes involved shall either be credited to payment of the Notes for the first months rental of the airplane to which the option applies or substituted as the payment for a new option granted under Section 21 of this Agreement. Upon the exercise of the option with respect to any of the former Right airplanes as described in Section 21 of the Option Note as to such option when paid may be applied at Lessee's request to the purchase price of any aircraft in lieu of application to the first month's rent as set forth above provided that no financial penalty results to American from such application. Upon the exercise of an option the airplane leased shall be considered as if it were Airplane I or Airplane II except with respect to its delivery date which will be governed by Section 4. American shall not be required to deliver more than six (6) airplanes during 1973 due to Lessee's exercise of the Options granted herein.

21. *Right of First Refusal.*

Lessee is hereby granted a right of first refusal until January 1, 1976 (hereinafter referred to as the 'Right') with respect to eight (8) additional BAC 1—11 401 aircraft in American's current inventory. The airplanes covered by this Right shall be those remaining in American's BAC 1—11 inventory, after other BAC 1—11 airplanes have been disposed of, which when added to the number of the two Aircraft and the eight option aircraft would total eighteen (18) airplanes. American shall notify Lessee of the terms and conditions of any bona-fide offer to sell or lease any of the eight (8) Right airplanes to a third party, other than an affiliate of American, and Lessee shall thereafter notify American of its agreement to buy or lease such airplane under the same terms and conditions as such offer within fifteen (15) calendar days of its receipt of such notice. If American is not notified as set forth above by Lessee, it shall be free to dispose of such Right airplane to a third party in accordance with terms no more favorable than those offered to Lessee in the notice. If such Airplane is not sold within sixty (60) days after Lessee's notification period under this Section terminates, to such

third party the Right shall be reinstated as to such Airplane. American shall furnish Lessee with a copy of the final contract with respect to each Right Airplane sold or leased to a third party. In the event that Lessee exercises an option granted under Section 20 of this Agreement with respect to an option airplane or airplanes a Right airplane or airplanes shall thereafter become an option airplane or airplanes subject to the provisions of said Section . except that the option shall be in effect for eighteen (18) months from the date such airplane or airplanes become option airplanes and the number of Right airplanes shall be reduced accordingly."

A conflict between the rights of National and American under paragraphs 20 and 21 arose when American notified National that it had offered to sell two of the Rights planes to a third party. In response to the notice, National notified American that it was exercising its option on the five remaining original Option planes and that the last five Rights planes, including the two which American had proposed to sell, were thereby converted into Option planes, leaving no planes for American to sell. American treated National's response as a failure to exercise its right of first refusal of the terms offered to the third party, as provided in paragraph 21, and proceeded to sell the two planes.

In determining the meaning of the contract with relation to paragraphs 20 and 21, every effort must be made to effectuate the intentions of the parties as they have been expressed in the language of the contract. (*United States Trust Co. v. Jones* (1953), 414 Ill. 265, 111 N.E.2d 144; *Marshall Field & Co. v. J. B. Noelle Co.* (1967), 81 Ill. App. 2d 409, 226 N.E.2d 454.) The contract is to be construed as a whole (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 154 N.E.2d 683), the language being given its ordinary meaning. (*Marshall Field & Co. v. J. B. Noelle Co.*) If the language in the contract is clear and unambiguous, then no evidence outside the contract itself may be considered in determining the contract's meaning. (*Herbert Shaffer Associates, Inc. v. First Bank* (1975), 30 Ill. App. 3d 647, 332 N.E.2d 703.) We conclude that the language of the provisions before us is clear and unambiguous and supports American's position. Although National has presented a considerable amount of evidence regarding the contract negotiations, its development of the market for the planes involved and the reasons for which the parties entered into the agreement, the evidence may not be considered in light of the clarity of the contract.

The thrust of National's argument is that, when it received notice of American's proposed offer to sell the two Rights planes, it had three possible courses of action. It could do nothing, it could exercise its rights under paragraph 21 and offer to buy the two planes on the same terms as outlined by American, or it could shift the Rights planes into the Option

category by exercising its options on planes already in the Option pool. National argues that American's giving notice under paragraph 21 does not extinguish National's rights under paragraph 20, because the contract contains no provision restricting National's rights under paragraph 20.

Paragraphs 20 and 21 create separate and distinct rights in different planes. The Option planes identified in paragraph 20 may be leased and purchased by National at any time during the contract period. National is correct in asserting that those rights are not extinguished by a notice made under paragraph 21. However, the real question is not whether National could exercise a paragraph 20 option, but whether the exercise of that option would also trigger the shift of the planes from the Rights category created in paragraph 21 into the Option category after American notified National of its proposed sale of the same planes under the latter paragraph.

Paragraph 21 contains American's agreement to offer the Rights planes to National in two different instances, each of which is conditioned upon the occurrence of an action either by American itself or by National. In the first instance, American agrees that, if it makes a bona fide offer to sell or lease any of the Rights planes to a third party, it will notify National of the offer and National shall have the first opportunity to buy or lease the planes, as the case may be, according to the terms and conditions offered to the third party. In the second instance, American agrees that, if National exercises a paragraph 20 lease option on one of the Option planes, American will then offer to sell National an option to lease a corresponding number of Rights planes. The former constitutes the right of first refusal given to National and is initiated by American. The latter effectuates a shift of a plane from the Rights category to the Option category upon National's compliance with terms set forth in paragraph 20. This means of acquiring certain rights in the Rights planes is initiated by National.

Both parties, then, have the power to exert some control over the Rights planes pursuant to paragraph 21, but it is, of course, impossible for both American and National to exert that control at the same time over the same planes. A similar situation occurred in *Northwest Racing Association v. Hunt* (-959), 20 Ill. App. 2d 393, 156 N.E.2d 285.

In *Northwest Racing*, the plaintiff had leased a certain piece of property which the co-executors of the lessor's estate subsequently contracted to sell to a third party. The lease contained a provision by which the plaintiff had the option to buy the land for a specific price. The lease also gave the plaintiff a right of first refusal should the lessor decide to sell. The right of first refusal provision allowed the plaintiff to purchase the property at the same terms and conditions in the proposed sale. The executors notified the plaintiff of the contract to sell the property at a

substantially higher price than was contained in the purchase option provision. The plaintiff offered to perform according to his purchase option, but the executors refused to sell for the fixed price. On appeal, the court rejected the plaintiff's construction and found that the provisions were neither conflicting with, nor repugnant to, each other, stating:

"* * *. Analyzing the contract, we believe that the first option was to be exercised at the instance of the plaintiff and plaintiff was given the right to purchase the premises at a stipulated price. The second option was to be exercised at the instance of the lessor and gave the lessor the option to sell the premises to a third person subject to the right of the plaintiff to purchase after receiving the requisite notice of the contemplated sale 'upon the terms and conditions proposed.' * * *

* * *

Plaintiff's right in the first option was a valid and subsisting right subject to an equally effective right of the lessor to sell to a third party. Obviously only one completed sale was contemplated, and the rights of both parties were fixed when either party elected to act under its option. In this case, the lessors fixed the rights of the parties by selling under the second option. Plaintiff failed to exercise its right under the second option * * *." 20 Ill. App. 2d 393, 397-98; 156 N.E.2d 285, 288.

As in *Northwest Racing*, there is no statement in the instant contract that one party's rights are superior to the other's. We therefore conclude that the rights must be considered to be equal, and American, as the first to assert its paragraph 21 rights, fixed the corresponding rights of both parties with respect to the Rights planes involved.

It is clear from paragraph 21 that National's rights to the Rights planes are alternative rights and could not attach unless either National exercised a paragraph 20 option and activated the shift of a plane into the Option pool or American notified National of an offer to sell or lease one of the Rights planes. In the event that a plane was shifted from the Rights category into the Option category, it became a "former Right airplane" which American could not sell or lease to anyone but National during the option period according to the terms set out in the contract.

Similarly, once American notified National of a bona fide offer to sell or lease a Rights plane, National could only acquire the planes in direct response to the notice as provided in paragraph 21. In the same sentence which states American's obligation to notify National of a bona fide offer, paragraph 21 provides that National "shall thereafter notify American of its agreement to buy or lease such airplane under the same terms and conditions as such offer within fifteen (15) calendar days of its receipt of such notice." National's reply to American did not contain an offer to buy

or lease any of the Rights planes at all. What National attempted to do was to place all of the remaining Rights planes, including the two contained in American's offer, in the Option category, where National was required to do nothing further once it paid $10,000 per new option. National thus failed to exercise its right under the right of first refusal provision in paragraph 21.

National's contention that its action was a proper response to American's offer because American had the corresponding right to force National to exercise its options earlier than National may have desired is not persuasive. The only options which National exercised were the existing paragraph 20 options on planes already in the Option pool. National exercised no options on any of the Rights planes, and its actions · had no permanent effect on those planes, for the planes were simply transferred from the Rights category to the Option category. National was under no obligation to purchase or lease any of the Option planes, and at the end of the option term, if National did not exercise its options, those planes would revert to American's fleet, unencumbered.

According to National's theory, then, it could effectively thwart any other sales or leases of Rights planes for the duration of the contract term, for it is unlikely that National would ever choose to buy or lease the Rights planes outright at a higher price if it could prevent competitors from acquiring them by transforming the planes to Option planes and taking several months to make its decision to lease or purchase, if at all, at a previously established price. Such a result would place all control of the Rights planes in the hands of National and would entirely neutralize the right of first refusal provision found in paragraph 21. In construing a contract, it is presumed that all provisions were inserted for a purpose and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions. (*Roosevelt University v. Mayfair Construction Co.* (1975), 28 Ill. App. 3d 1045, 331 N.E.2d 835; *J & R Electric Co. v. Edward P. Allison Co.* (1970), 125 Ill. App. 2d 123, 260 N.E.2d 755.) National's position is inconsistent with these principles and is therefore unacceptable.

National's contention that the rights under paragraph 21 are subordinate to those under paragraph 20 because the first stated provision should prevail if there is a conflict with one that appears later is also without merit. We find no need to apply this principle which has been used only as a last resort when the conflicting provisions are entirely repugnant to each other. (See *Northwest Racing Association v. Hunt* (1959), 20 Ill. App. 2d 393, 156 N.E.2d 285; *Samuels v. Meyerovitz* (1933), 270 Ill. App. 210.) Furthermore, as we have stated previously, the two paragraphs create distinct rights in different airplanes and the conflict arises only within the provisions of paragraph 21. Moreover, the

application of the principle as submitted by National would nullify its ability to shift Rights planes into the Option category. Its right to do so would fall either because paragraph 21 is subordinate to paragraph 20 or because the provision regarding the shift of planes to the Option category follows the language which requires National to accept or reject the Rights planes according to the terms offered to the third party.

Finally, the language of paragraph 21 itself implies that upon notification of a bona fide offer to sell or lease a Rights plane, that plane is not available for transfer to the Option category. The transfer provision applies specifically to Rights airplanes, while a previous sentence in the same paragraph provides that "the Right shall be reinstated" to such an airplane if it is not sold within 60 days after the end of National's notification period. Therefore, once American notified National of the offer, the planes in question were not available for any other disposition by National except according to the terms in American's proposed offer and they were removed from the Rights category, subject to reinstatement only if the third party sale was not consummated.

American exercised its rights under paragraph 21 and notified National of its actions and thus defined the rights of both parties. National acknowledged that it received notice but did not respond according to the provisions of paragraph 21. While National could still exercise its paragraph 20 options, the two Rights planes referred to in American's notice were not available to National under the "shift" provision of paragraph 21. National therefore did not have any rights remaining in the two planes and American had the right to sell them. The judgment of the circuit court of Cook County in favor of American is therefore affirmed.

Affirmed.

WILSON, J., concurs.

Mr. PRESIDING JUSTICE SULLIVAN, dissenting:
I disagree with the conclusion of the majority.

Under the agreement in question, National leased two aircraft from American and, at the expiration of the lease term, exercised an option under paragraph 6 to purchase them for a specific price. In paragraph 20 of the agreement, National was granted the further right to lease eight more of the same type of aircraft (the Option planes) and to purchase them at the end of the lease under the same terms and conditions applying to the original two aircraft.

At that time, American owned eight additional planes of the same type and model and, in paragraph 21, National was given the right of first refusal in the event that American desired to sell those planes. This

paragraph required American to notify National of any bona fide offer to sell and provided that National "shall thereafter notify American of its agreement to buy or lease such airplanes under the same terms and conditions as such offer within fifteen (15) calendar days of its receipt of such notice." These eight aircraft were termed Rights planes, and paragraph 21 contained also what is termed the "roll over" or "shift" clause, which provided that when National exercised its right under paragraph 20 with respect to one or more Option planes, a similar number of Rights planes would become Option planes subject to the provisions of paragraph 20.

It appears that prior to July 18, 1973, National, in addition to the purchase of the original two aircraft, had exercised its right granted by paragraph 20 as to three of the eight Option planes, and it is uncontradicted that by this action three of the Rights planes became Option planes under the "roll over" provision of paragraph 21. Thus, there remained five Rights planes on July 18, 1973, when American notified National under paragraph 21 that it proposed to make a bona fide offer to sell two of the remaining five Rights planes to a third party, and National was invited to exercise its right of first refusal by notifying American within 15 days that it would acquire those two planes on the same terms as the offer. National did not do so; but, instead, on July 26, 1973, informed American it was exercising its paragraph 20 right as to the five remaining Option planes.

It is the position of National that when it exercised this right, the five remaining Rights planes by virtue of the "roll over" provision of paragraph 21 became Option planes and were not available for sale by American. The majority opinion, however, has accepted the position of American that when notification was given to National of a bona fide offer to sell two of the Rights planes, the subsequent exercise by National of its paragraph 20 right as to the five remaining Option planes caused only three of the remaining five Rights planes to be "rolled over" into the Option category, but not the two Rights planes which were the subject of American's offer to sell.

As a basis for this holding, the majority concluded that because there was no statement in the agreement that the rights of one party were superior to those of the other, "the rights must be considered to be equal and American, as the first to assert its paragraph 21 rights, fixed the corresponding rights of both parties with regard to the Rights planes involved."

From this conclusion, they reason that because American gave a paragraph 21 notification to National of an offer to sell two Rights planes before National exercised its paragraph 20 right as to the Option planes, that those two Rights planes were not "rolled over" and that National

could only acquire those planes by exercising its right of first refusal under paragraph 21.

There appears to be no justification for this position, for several reasons. First, while there is no statement in the agreement that the rights of either party are superior to the rights of the other, neither is there any statement that American's notification of an offer to sell would preclude or suspend the operation of the "roll over" clause. Second, there is no provision in the agreement to support the conclusion of the majority as to equal rights and, as a matter of fact, the agreement does not specifically provide any rights to American which initially owned all 18 of the planes involved in the agreement and, of course, could have sold any or all of them. However, it restricted this right to sell by entering into the agreement in which it gave National the right in paragraph 6 to lease-purchase two of those planes and agreed in paragraph 20 that eight of its planes be categorized as Option planes—with National given the right to lease-purchase them. Then, in paragraph 21, American gave National a right of first refusal before it would sell any of the remaining planes which were called Rights planes and, in the same paragraph 21, American agreed that when National exercised its paragraph 20 right as to any of the Option planes, a similar number of Rights planes would then become Option planes and thus not be subject to sale. Third, because the "roll over" clause immediately follows the notification provision in paragraph 21, with nothing stated in that paragraph or anywhere else in the agreement that notice of an offer to sell would preclude or suspend the "roll over" of Rights planes when National exercised its paragraph 20 right as to the Option planes, it would appear that the parties did not intend any such preclusion or suspension.

There is no question that paragraph 20 of the agreement gives National the right to lease-purchase the Option planes and, because there was no other provision specifically qualifying that right, it seems incongruous to read into the agreement, as the majority in effect does, that the parties intended a suspension or preclusion of the "roll over" clause as to any Rights planes included in American's notification under paragraph 21. Rather, because the "roll over" clause is also in paragraph 21 and follows immediately after the notification provision, it appears to me that the parties intended that the exercise by National of its paragraph 20 right as to any Option plane or planes would shift the same number of Rights planes to the Option status and that this shifting would occur even though American had notified of a proposed offer to sell two of the Rights planes. Thus, when National did exercise its right as to the five Option planes, the remaining five Rights planes, including the two which were the subject of American's notice, became Option planes and were not subject to sale by American during the time provided for in the agreement.

From this reasoning, it follows that the trial court erred in granting judgment to American at the close of National's case, and I would reverse and remand for further proceedings.